v. Diaz Case Consolidated Case Numbers 242778 and 251618 Hold on a second. Good morning. Good morning. May it please the court, Rajiv Dosanjh for the United States. The compassionate release statute is an exception to the bedrock rule of finality in sentencing. And for that reason, this Court and others have emphasized that its terms must be construed narrowly. So how much time did this man spend in penitentiary? In All told. All told, he spent 28 years in state custody and four years in federal custody. Okay. And so for the 2553, 3553 factors to have been faithfully applied in this case, how much time should he be spent? Your Honor, it's the government's position that the sentence required by the or mandated by the guidelines originally and recommended by the guidelines now is the appropriate sentence. And that's what, 60 years? It's a life term of imprisonment, Your Honor. So he was transferred from parole in New York or transferred from custody in New York to, and paroled to federal custody to begin serving a life term. So he, that is what the government believes is the appropriate sentence. Now, obviously I can't stand here and say that a district court does not have discretion under the compassionate release statute to lower that based on changed circumstances. Do you believe that Judge Hurd abused his discretion in the sentencing that he posed? Under these circumstances, yes, Your Honor, because if you, it's not an exaggeration to say here that Mr. Diaz served no time for the murder of Michael Monsoor in federal, the federal crime that he was granted the life term from by the jury. The jury, he was, we sought the death penalty originally. The jury granted him mercy and said, no, I'm of the belief that he would be serving a life term. Do you think it was a miscarriage of justice not to execute this man? Your Honor, no. Sorry? No. But it's, Your Honor, it's, that was the jury's prerogative to decide. And they did decide based on arguments that he would spend a life term in federal custody. Could the sentencing judge have imposed that life term concurrent with any future state sentences to be imposed? At that time he could have. Okay. So, so, so the jury, this idea that somehow by imposing a life sentence the jury was, we have to honor the jury's verdict by, on the penalty phase by not allowing concurrent sentences, that doesn't, that doesn't hold up, right? Well, Your Honor, the consecutive nature of the sentence was final. That's part of the, that's the, that's the finality part of this. And so was it a life sentence? It's a life sentence, but the, the compassionate release statute allows the judge to reduce the term of imprisonment. So he could have reduced it to four years? Your Honor, he, he could have, but we think it would have been an abusive, it is an abusive discretion. And again, I want to emphasize. It would have been substantively unreasonable in, in that way an abusive discretion? Yes, Your Honor, and also the way he did it in this case. No, I understand the, the way you're saying the way he did it in this case. But if, hypothetically, if we said, you know what, the way you did this isn't okay, remand and reconsider, the judge could say, I think, all right, I've reconsidered, I'm giving him four years, I'm reducing his sentence from life to four years. He could, Your Honor, and he would have to explain it. That's the Right. He did explain it. He said he would, that's the result he would come to if he sent, if he got it again. Your Honor, if you look at what he said in his sentencing reduction order, everything he said about the 3558, 3A factors was justifying a 420-month sentence. He ignored the fact that that was consecutive. He couldn't change that. And so if he wanted to reach this result, he would have had to give Mr. Diaz time served, which is what they asked for. He was uncomfortable doing that. He, he did not justify that, that reduction. He justified a much more modest reduction from life to 35 years. So we don't actually know. Where did he spend these 35 years? So 20, the 28 years of those, of that time was spent in State custody. Where? Your Honor, actually, off the top of my head, I do not know which State facilities he was in. And so, but I, again, Your Honor, he was released to custody of the Federal Government, and BOP took custody of him. And again, I want to emphasize something. He, the judge did not change the five-year consecutive term for the 9, just for the 924C offense. So effectively, he has not served any time for killing Michael Monsoor. So what is the, what is the... For the murder of another person in New York City, for Bonnie Baer's murder. That was not prosecuted by, and the Federal Government could not prosecute that, that case. It was, that was prosecuted by the State of New York, which had the right to determine how much time he should spend for that offense alone. And it did, under the belief... You didn't want, you thought it was an abuse of discretion for Judge Hurd to, you know, say, you know, 35 years locked up in a State penitentiary under, considering the compassionate relief standards and issues was enough? You think he just screwed this up? Well, Your Honor, I mean, to use your words, I think he clearly screwed this up because he was using the... Yes. I mean, he used the compassionate relief statute in a way that I think was, he was trying to get around having to do what they asked him to do, which was reduce a life term to either four years or, what I believe, for the murder of Michael Monsoor, was effectively a zero term. And he didn't want to do that. So he found a way that's not contemplated by the... What is it that you want to erase? We want this to be, we want it to be remanded to the district court with the clear instruction that he cannot give credit, he cannot run, he cannot change any other aspect of this term except that he can reduce the amount, the term of imprisonment for each offense, which is what he actually did in his judgment. He went through each count of conviction and reduced it. But he then did this credit thing first and then... Crediting a discharged term. Right. It was clearly illegal. And then he has no authority to run, to change the way the judgment ran. His only authority, and this is, again, why finality is such an important kind of background here, the compassionate release standard, or statute, allows you to do one thing. And so he could do that one thing, and I have no doubt. What does that one thing? So he can reduce the term of imprisonment. Now, if he wants, I can't stand here and say... When you say the term of imprisonment... For each offense that he was convicted of federally. And I can't stand here and say that somehow Judge Heard is going to change his mind about wanting Mr. Diaz to be released. But he's going to have to explain that decision with reference to the case. Fundamentally, this is as I understood your argument going in, but then I think you got a little blurred. You just want a justification, an actual explanation on the record. For, if he wants to give time served, why is that appropriate when he never served any time in the state prison for the murder of Michael Monsoor. Now, I understand... Michael Monsoor served 35 years in jail. In state prison. So you want him to clean up his paperwork. It goes more than that, Your Honor. A little bit more. To clean up his paperwork. But the government, if I understand you correctly, is not objecting to the fact that Judge Heard thought that 35 years was enough. Your Honor, we are objecting to that. You say more was required. Yes. How much more was required? Your Honor, again, the government's position is that Mr. The government's position is he should never get up. Your Honor, the government's position is that under the circumstance that he presented and the reasons that were given, there was not enough of a justification to reduce his term. That was an inadequate justification? It was inadequate because he was justifying, first of all, he was justifying the wrong thing. He was justifying a 420-month term. And again, Judge Heard has never backed a time-served sentence. What he did was, I want to say I gave him 35 years for the murder of Michael Monsoor, the drug trafficking, and the gun crime. But he actually did not do that. And he never really justified why it was appropriate to give him credit or to run these two very different crimes, the terms consecutively. So suppose he had given him 10 more years, 45 years, and not life. I take it the government's position would still be that that was improper. Your Honor, it would, again, Your Honor, it's understand, like, I have to make clear, it's the judge to determine what's appropriate. It's us for determining. It's the judge who determines what's appropriate in that sense. But the government has a chance to, based on his justification, to see whether that's sufficient, and whether we think it's not, to try to appeal. Suppose we give him 10 more years, 45 years. Would that have satisfied the 53 factors, or would that have been a determination that would have gotten him back up here on another appeal? So, again, Your Honor, we have, when we make a recommendation to appeal and the Solicitor General gives approval, it's based on our likelihood of success. And I want to say, like, I understand that if he had given him 10 more years, or if he had kept him in prison longer, that we likely would not have been able to convince him. But that's discretionary. I'm asking you a somewhat different, I guess, hypothetical question. Would the 10 more years have satisfied the 35 factors, or should the – Well, the government's position is no. The government's position was, I think you told me that the government doesn't think it was a miscarriage of justice that the guy wasn't executed, right? Right. Okay. So if you'd given him 10 more years, would that have satisfied the government? Again, Your Honor, no, because we believe for two murders – No, 15 more years. Again, we believe in life. We believe in life. He's got a 50-year sentence, and you don't – He didn't get a 50-year sentence, Your Honor. No, this is hypothetical. 50 years in Dannemora doesn't satisfy your office? He's – again, he's being – he had been prosecuted by the State of New York for a separate crime, a cold-blooded killing on the streets of Manhattan that had nothing to do with the Federal offense. He was the same – it was the same person. He was carrying the same gun, but it had nothing to do with what the Federal government had prosecuted. It wasn't relevant conduct. And the only way it was related was that it happened to involve the two same people. But, again, like, so if you're thinking about the murder of Michael Monsoor, it's the government's position that the life term for that offense was appropriate and that it's appropriate. Also, I will grant, because he did commit another murder, but that's being prosecuted by a separate sovereign. And so when you say a 50-year sentence – I will agree, Your Honor, it was a horrible crime spree. But I'll also say that it was not as if these were impulsive crimes. He planned with Tyrone Walker the execution of Michael Monsoor. They knew they were going to do that. Terrible murders. No question about that. We're not talking – nobody's justifying that. We're just talking about the government's position that, you know, 35 years in Dannemora didn't get it done. Ten more years in Dannemora didn't get it done. But he wasn't in Dannemora for the murder of Michael Monsoor. He was in Dannemora for the killing of Bonnie Bear in Manhattan. So you would ask us to assign error in two ways, as I understand it. One is the failure of Judge Hurd to adequately explain the 3553A factors in order to justify what he did. Right? Well, I think the initial error was in saying that he could change the judgment.  Yeah. He can't change the original judgment. I'll try to get to that second error. And so that is the initial error, the legal error that he made, was saying – Now, when you say – but let me just be totally clear so that I understand your position. When you say he can't change the judgment, it's really about the consecutive nature. Right. Of the sentence.  He can't – the only thing he can change about the original judgment is he can reduce the term of imprisonment for each count of conviction. And he recognized that in his judgment when he's talking about the reduction he's going to make. He goes through each count of conviction. But then he took an extra step, in your view, which was to erase the consecutive nature of the sentence.  So if he'd spent a little bit more time on the paperwork, you wouldn't be objecting to this? Your Honor, this is not a paperwork – I don't think you can dismiss this as a paperwork problem. This is a fundamental way for him to have his cake and eat it, too. He's saying I'm imposing – How do you have his cake and eat it, too? He's saying I'm imposing a 420-month sentence for a murder. And then in one line, without explanations, says, I'm going to give him credit for a separate murder that was prosecuted by a separate sovereign in which he served a separate amount of time. It was never in front of the federal court. The only thing he was prosecuted in federal court was for the murder of Michael Monsoor and related crimes, including drug trafficking. I mean, that seems to me to be a – bizarre is too strong a word to describe that argument. I was a district court judge before I sat here. And if I saw someone who'd spent 35 years upstate, I don't see myself saying, well, he was at, you know, Dannemora rather than Otisville, so he's not being punished for that. That seems to me a very kind of constricted way of looking at the realities of what happened to this man. Your Honor, also the reality is, is that he had a final sentence in federal court that was supposed to be consecutive for a separate murder. That is the reality. He was never punished in New York State – by the New York State court and judge for the murder of Michael Monsoor. This was not part of what they prosecuted him for. Mr. Deschamps, you deserve some time for rebuttal. Yes. Thank you, Your Honor. Are you here on pro bono basis? Yes, Your Honor. Well, thank you on behalf of the Second Circuit Court of Appeals. Thank you, Your Honor. And good morning, and may it please the Court, Jonathan Evan for the appellee, Walter Diaz. The district court found that for extraordinary and compelling reasons that the government is not disputing, Diaz should spend a total of up to 420 months in prison. The judge did go through the 3553 sentencing factors, and that's the conclusion he reached. Now, the government is quibbling with the technical means by which the court chose to execute that substantive conclusion. We are all about technicalities here. I understand, Your Honor. So we think the government forfeited those technical challenges. But more to the point, I want to spend a couple of minutes about the substance of that sentence and about the discretion to provide it. About the substance, the district court knew that the government during the trial and throughout the federal trial treated the federal and state offenses as very closely related. The government told the jury to try and get a death penalty. They told the jury in opening that the monsoon murder included, quote, how Mr. Tyrone Walker and Walter Diaz fled to New York City, which is where the next crimes occurred. It was part of the fleeing. The government went to the public. Okay, I'm sorry. You're telling us what this judge knew because you've reviewed the record. But Judge Hurd, on this part of the case, did not, I don't think, recite those relatedness factors, right? I think he did recite the relatedness factors and he did actually found that he did. In the original order or the order granting reconsideration? I believe he said in both that these are related based on reciting some of these factors and knowing these factors because the record was before him. But I think the most more salient point that I'm trying to make, Your Honor, is that within this sentence that he then provided and reached a conclusion about, as Your Honor asked, there is no doubt that if Judge McAvoy issued his sentence in 1996 as a concurrent sentence because it mattered, for instance, 35 years concurrent, that would have been fine to do back then. The government is treating concurrency as a bug instead of a feature of the sentencing apparatus. That's not the case. The case is that at the time Judge McAvoy didn't even know what the state sentence would be that came after. The fact is that the state sentence here actually wasn't 28 years. It was 15 to life. And so the way to think about this sentence is a 35-year federal sentence that some of it may be spent in a state penitentiary, which is something that happens pretty often, and in fact it could have been 20 years in federal prison had Mr. Diaz been paroled after 15 years. Okay. So I find it tempting, some of this argument. But let me ask you where we actually are in this case is there is no state sentence to which to run the federal sentence concurrent. I think I got all the prepositions in the right places there. But you can run a sentence concurrently with another sentence. And all of 3584 and everywhere we do that is an undischarged sentence. What I'm trying to figure out, and maybe I'm being pedantic, but how do you run a sentence concurrently with a sentence that's no longer running? So if we were in a different place, and this had happened five years ago when Mr. Diaz was still serving his state sentence, actively in custody serving the state sentence, and he, of course, is on parole, so there's some interesting questions there, but then it makes more sense to me. I'm having trouble with that last step. I'm having less trouble with the idea of the ability to change concurrent versus consecutive than I am with the ability to run anything concurrent to a sentence that's no longer running. So I think there are two answers that we gave to that, and I think both are right. One is that the correct time to think about whether to run it concurrently or not was at the time of the original sentence and not right now. At that time, clearly there was an anticipated state sentence that eventually, in fact, came to being. And that is the right time at which to judge because that is the time. But we can't correct that judgment now. That's not what compassionate release allows us to do. I agree. It's not correcting it. It's reducing it, and that is one form of reduction, as we said in our papers. The point there is that that was the right time to adjudicate whether there is a sentence to which it can run concurrently or not. Oh, okay, so it's as of the moment that the original sentence was imposed that we take that into account? I think that's right, Your Honor. Otherwise, we are in the very unfortunate or weird situation where Mr. Diaz obviously could not or probably could not seek any change to his federal sentence. Sure he could. He could seek it to be four years. Back then. And now we're being told, well, you can't run it concurrently. The other issue that Your Honor, I think, alluded to is that under the specifics of New York State criminal law, the sentence is, in fact, not discharged. The sentence is under parole and under New York law. We cited Section 70, I believe. So forget New York law. Under our law, under federal law, I think that we take a different view now about whether it's discharged or whether or not it's discharged. So I think this Court has held that point in question in the Hill case. We know the Eighth Circuit, when applying the CODA law that is very similar to the New York law, came out the way that we would suggest it should come. But as a matter of its own federal analysis under federal law. As a matter of federal analysis of what is a discharged sentence looking into. I'm just quibbling with you because you're telling us just defer or rely on New York law. This is not about New York law. No, no. I'm sorry if I was unclear and then I misspoke, Your Honor. But my point was just that whether this sentence is discharged or undischarged for purposes of federal law, one can look to New York law which actually imposed this sentence. And under New York law, this sentence is not discharged because Mr. Diaz is still serving that sentence, albeit outside of prison. Your position is also a lot of this has been waived, wasn't preserved, right? We think all of it has been waived, Your Honor. They didn't object at the right time. So even though we've been talking about, you know, 35, 50 years in jail, all of this, you believe, is before us on plain error? We believe that all of it is before you on plain error. The government did not object on this ground in the first instance they had an opportunity to, which was in their opposition brief to our motion for sentencing reduction. They mentioned specifically our concurrency argument once in footnote 10. That's in JA1136, I believe. They said Diaz's argument for concurrent sentencing is a concession, and they go on to explain what kind of concession. They also argued if the court reduces Diaz's sentence to a term of years, the term should not run concurrently to the state sentence because, and the only reason they give is, concurrent sentence does not adequately deter a spree of violence. Nothing about authority. That's in JA1044. In JA1931, where they say while a sentencing court has the authority to order sentences to run concurrently under certain circumstances, the only sentences the court chooses to run concurrently were the federal sentences. And basically I'm just looking at the specific language, but they seem to challenge the ability of the court to do what it did here with respect to the concurrent consecutive issue. So I believe that was at the clarification, Your Honor, that came months and months later after the first time that we raised it. But they objected. Eventually they objected. So on this record, why can't we view that as an objection? Because I believe the rule is – I believe our law is clear that it has to be a contemporaneous objection, right? I understand it doesn't need to be contemporaneous, Your Honor, but it needs to be when it is first sought and granted. When the issue was first raised. Correct. And that is – that was first raised in our original motion. They did not object. We came back in our reply brief and stated it as clear as possible. The government does not dispute that this court has discretion to run federal and state sentences concurrently in the context of resentencing. They moved to strike these portions of brief – of this brief because they said it raised on reply things that you didn't raise in your opening, but not this part. Would you – what is – is there a circuit decision that has held that 3582C2, I guess it is, does not enable a district court to order the sentences run concurrently rather than consecutively? There is – That does say or decide that a district court can do what Judge Hurd did here. Thank you, Your Honor. That's an important clarification. Yes. But it doesn't change – But it doesn't change my answer. There isn't a decision one way or the other. The government actually does cite in its brief one district court that has done that in the Eastern District. That's the U.S. v. Reed case. The decision itself is not very clear on that, but if you go to the amended judgment, you see that the judge recognized that without running things that were consecutive concurrently, they were going to have a gap as to stuff that is in the – at the time. So there is no court that goes one way or the other, but I think other than putting aside the fact that the proof is somewhat in the pudding that it took the government four briefing rounds before that argument even occurred to them, which suggests to me that it's not very plain that this is clear. But beyond that, I think that the Supreme Court cases on this issue suggest to us that there is plenary authority to do this. I think Setzer – What Supreme Court authority are you adverting to? I'm adverting to the – I'm referring to Setzer, which tells us that somebody needs to decide this issue of concurrency, and that is part of the inherent powers that don't come from any statute, just the inherent powers of courts based on common law. I then look at Concepcion that says that in a modification, you have all the inherent powers that the judge has, all the inherent powers that the judge had at the original sentencing subject to limitations that are expressed in the statute. And so here we obviously crossed the major Rubicon to get to a modification. We showed extraordinary and compelling reasons. That is not disputed. Once we get there – The problem that I have, I think, with the argument – maybe I should just not preface it with the problem. But the question is we have said that compassionate release is not a plenary – is not meant to be, intended to be a plenary resentencing. And it's actually pretty narrow, right? And I understand what you're saying about the Setzer case, but it seems to me that the Supreme Court may be going in a different direction. So what is your – what's your response to that? So I think it is very narrow. It is very narrow because you need to show extraordinary and compelling circumstances. That is a major filter. I'm sure know better than I do because you see these cases. Most of these cases fail to cross that particular filter, which is a major filter. But once you cross that filter, we get to the world where Setzer and Concepcion tell us that the inherent power under C1A at least – obviously C2 and C1B are different – but under C1A the inherent power moves forward absent some express limitation in either the guidelines or the statute. Here it needs to be the statute because the statute itself doesn't say that you are subject to the guidelines. And that's what we have. And so obviously this is not a resentencing, and that means that there are meaningful differences. In Dillon that the government relied on, the Supreme Court, as we know, found that – If we were to disagree with you, Mr. Evans, about the categorization of the state term as a discharged term or undischarged term, what's your argument then? In other words, if we were to say, yeah, we understand the New York law, use it one way, but as a matter of federal law we're going to view it a different way, what is your argument then? My argument there is that I think the same analysis under 3553A would reach the same conclusion, and a judge could certainly give a very detailed explanation saying I would have done this concurrently, I would have done the following things, I wasn't given the opportunity to do that because, for instance, because it's now deemed discharged, and so I use my inherent discretion to reach the same conclusion in a different way. The government says that is not the explanation that is provided by Judge Hurd here, so there's an inadequacy in the justification and explanation. So I don't think there is an inadequacy because, as you know, we think that the government has waived that argument and therefore – So that goes – so if I were to disagree with you about that, that it's forfeited, that argument, and that we're not on plain error, that actually we're just reviewing this, what then? I'm just trying to figure out the decision tree here. I think the decision tree is to – the option one, which I think is the right option, is to understand that the judge here didn't say I'm running it concurrently, where does it end up, 420 months. He did the reverse. He did the whole analysis, reached 420 months, and said, and this is the mechanism I choose. And from that, I think it's pretty clear that had he been given the opportunity, he would have chosen a different mechanism if he had to do so. The other option is something like a Jacobson remand to ask him, would you – So we could have a remand like that. I mean, understanding the decisional tree and understanding you disagree on some – at some junctures. So I would say yes, that is certainly an option that is open to you. I would urge the court, if the court reaches that, which I sincerely hope it will not – but if the court reaches that, I would urge the court to do that through a Jacobson-like mechanism and not a vacateur because Mr. Diaz is working, is part of the community, that the last thing he needs now is to be sent back. I understand that difficulty, Mr. Jaffray, very much. I appreciate that, Your Honor. Okay. Thank you very much. Thank you, Your Honor. Thank you very much. Government? Briefly, Your Honors, on pages 4 to 12 of our reply brief, we go into detail why we did not forfeit these arguments. If you look at their motion, repeatedly what they're asking for is a time-served sentence. They did not seek a concurrent sentence. That was just not part of their argument. Now, in an abundance of caution, what they were saying was a time-served reduction, which is, again, they are reflecting the reading of the plain text of the statute, which says you get to reduce the sentence – sorry, you get to reduce the term of imprisonment. Does the government believe that – do you contest that he fulfilled the criteria for compassionate release? For eligibility, no. We're not contesting that on appeal, Your Honor. It's – again – So he's profited – offered up extraordinary justification for the release – for the relief that Judge Heard gave. For being eligible for – to seek a reduction. And he has to then explain why the 3553A factors now would justify reductions. But we're not – again, Your Honor – Again, our decisions to appeal are based on multiple factors, including our chances of success. What did you think? Which of the – what do you think in his application were the most conspicuously compelling factors that he presented? Well, Your Honor, if it was me to judge, I would say that his efforts at rehabilitation have been very laudable. What did he do? Your Honor, he apparently has earned his degree. He helped other inmates. He was part of a lot of programming. He also – Your Honor, again, I don't want to, you know, also make light of the fact that he suffered abuse in the state prison, too. What kind of abuse? What are you talking about? So apparently he brought a suit against the State of New York for being physically abused by the guards by the State of New York. Again, this has not happened in federal prison. But that is definitely a factor. He got over $300,000 settlement? Correct, Your Honor. I've never heard anything like that. Your Honor, it is unusual. I think it's not as unusual as it used to be. I think there's – You still want the other 10, 15 years. I'm sorry, what was that? You still want the other 10 or 15 years? Your Honor, again, this is – what the government believes is the appropriate sentence was what was imposed initially, which is – So the answer is yes. Yes. For the murder of Michael Monsoor, yes, we believe a life term is the appropriate term. Well, so in view of the fact that he clearly qualified for this compassionate reduction, how would that be effectuated in the government's view? Your Honor, given the seriousness of – A life – Given the seriousness of murder – The government is seriously with a straight face arguing to us that notwithstanding the fact that he demonstrated extraordinary circumstances justifying this compassionate – Eligibility.  Treatment, he should still do a life sentence. Given the seriousness of the offense, yes. That doesn't seem a little bit contradictory. Not at all, Your Honor. He is – that's how the statute is set up. But you don't want him executed, right? Your Honor, that is a jury decision that was made in 1996. So, again, he's faced a life term. That was the term that was imposed by the federal court for murder of a different person than he murdered in Manhattan. And if – again, I don't think the government has to say that that's somehow a shameful position to think that someone should serve a life term for murder. Would you respond, understanding that Mr. Chauvin was responding to my question, to the possibility of a Jacobson v. Mann for clarification? Well – And understanding, I think, also that one of the errors that you would have us assign to Judge Hodes' judgment is this consecutive concurrent – Right. And that's not really subject to clarification, it seems to me. It's – no. I mean, if this is a – that – I think that aspect of it has to be vacated. And I think also the – once you get rid of that, you would have to undo the whole thing because, again, repeatedly in his judgment and in his order, he said, I'm justifying a 420-month term. Now, he – that's – and when BOP got this judgment, they thought what he meant was, like, he's going to serve a 420-term in federal prison because we can't give him credit. And we can't – and there's no concurrency order in this. And what BOP did not realize when they responded to it in an email was that you can't order concurrency. You can't change the concurrent or consecutive nature of the original sentence through a compassionate release term – application. Is there some other way to do that? I'm sorry. Is there some other way to do that? That's the relief they requested, which initially and throughout their papers was a time-served sentence. So that's what Judge Hurd has to now explain. If he wants to do that – Time-served. Time-served. He's got to explain why that's an appropriate term. As opposed to putting it on the statement. Right. Right. I mean, because, again, that's a separate murder that the State prosecuted. But if Judge knew all of this and granted compassion and release, what else – what more would you possibly expect him to say? He's a busy district court judge. Your Honor – He doesn't like to waste time. Your Honor, he was asked repeatedly for a time-served sentence. He said no. And he said a sentence of 420 months reflects the seriousness of these crimes while promoting respect for the law, et cetera. He never said a sentence of time served, which effectively means he – Mr. Diaz has served no time for killing Michael Monsoor because of his five-year consecutive 924C offense and conviction, which the district court did not touch. He served no time for killing Michael Monsoor. Explain that. That's what the explanation needs to be. Why is that appropriate under 3553A? That's if we didn't forfeit this.  Your Honor, and I – again, you explained in detail why we did not. It's the judgment that's up here on the review. It's a well-written brief, but Mr. Evens, people write good briefs too. Counsel, how long has Mr. Diaz been out now? How long has he been out, give or take? Remind me. A year? Almost a year? Something like that? I think it's running up to that time, yes. Okay. So? So that could be another factor. Again, Your Honor, again, the compassionate release concerns the circumstances at this moment. Right. So, well, yes. But let me ask this. If this case were remanded in any form, would the district court be empowered to consider, as part of the 3553A factors, how well he's doing now? Yes. All right. And to be clear, your argument does not hinge on the fact that the state sentence was discharged. It is, even if it were not discharged, you would still assert that it cannot, you can't run a sentence concurrent that was once run consecutive. Yes, but I would say it would be both. I mean, as a matter of logic, I don't think you can run something concurrently that's run. But even if, heaven forbid, Mr. Diaz were to violate the terms of his state parole and go back into state custody, in which case there would be, undisputably, they now dispute whether it is or is not discharged, but be undisputably undischarged, you still would say that the federal sentence could not be retrospectively run concurrent. No. Again, because of the terms of the compassionate release statute, which all allow you to, all the things you can do is reduce the term of imprisonment for each offense. Thank you very much. Thank you. For the argument, in the final matter on today's argument calendar, McKenna v. Kenya and his thesis, the ASAP Logistics, case number 251807. Good morning. May I proceed? Good morning. You know what? Hold on one second, please. You lost your audience. Well, except us. Your principal audience, I know. We don't have the high school team here as well. Good morning. Good morning, Your Honor. May it please the Court. My name is John Ruskoski. I represent McKenna v. Kenya and D'Souza v. MKE. This case involves MKE's damages and the confusion of many customers caused by defendants' willful fraud and the attorney fees caused by that fraud as well. Due to the misstatements made by defendants, including Ms. Cross personally, prior to the litigation and in the litigation, significant discovery was required to uncover the complete facts about how many customers had been defrauded as well as other things that caused attorney fees. And all this works against the backdrop of the Lanham Act, which has dual goals, to protect trademark owners but as part of that to deter similar acts from taking place. All right. You just said that some of what happened with Ms. Cross and the ASAP parties led to the need for more extensive litigation. And so that feeds into the need for attorney fees. By my read of the district court docket, it looks to me like within somewhere between 4 days and 12 days from when the defendant parties either waived service or were served, the stipulated injunction was entered and all of the relief that your client eventually obtained was secured. That within the first 10 days of litigation, and I count that not from the filing again but from service, but within the first couple of weeks of litigation, all of the relief eventually secured had been obtained. And so why are you – I get that a prevailing party is a macro concept, but when the court has discretion and it's only in an exceptional case, why are you entitled to attorney fees to get nothing more between day 12 and the final day of the district court proceedings? For three reasons. And I guess I'll gently push back on the idea. Certainly by the time – I believe you're referring to the preliminary injunction that stopped the infringement. But there were additional things that needed to take place. First of all, even after the preliminary injunction took place, there was already a determination that had been withheld throughout the pre-discovery and discovery period about this website that was further litigating or publishing to the public that ASAP had this exclusive license. And we'll get back to that in a second when we talk about the importance of the damage. So there was an additional source of violation that wasn't covered by the preliminary injunction but is covered by the permanent injunction? Correct. So that's number one. Number two was determining the total source and how far this fraud had been widespread. Again, taking a step back, the way MKE learned about this was in a public forum. They were at what's called the SHOT Show, one of the largest trade shows in the country, where they were angrily approached by a customer saying, how could you defraud me like this in front of a group of individuals? Now, when we approached that, that's what we knew about. We didn't have discovery and there were some pre-discovery discussions. And there was an insistence that that was the only, in other words, that there was no effort to come clean. What was said, both in interrogatory responses, sworn interrogatory responses, signed by Ms. Cross, as well as to Judge Gardefee. And again, I don't fault Mr. Mandel for relying upon his client, but what he represented to the Court at that time, Judge Gardefee, was there was only one occasion this took place. That was the party M42. But the preliminary injunction, whatever had been happening, didn't the preliminary injunction say no more, full stop, no use of MKE's name, trademark, symbol, anything, however many instances it appears in? But that does not address the damage or the confusion caused to others. But you didn't win on damages. So if we don't reverse on the damages question, if the net total of the relief you succeed in getting is the permanent injunction, you had all of that relief two weeks in, right? We did. But let me tell you, at least suggest to you, two reasons why that doesn't matter. Again, because at the end of the day, going back to the Coach case, the Second Circuit's opinion going back to 2022, damages are not a predicate in order to obtain attorney's fees. Right. Just clear stuff. The pillars that we look at is was there willful infringement, and certainly I'm not suggesting willful infringement alone is enough, but that's certainly a strong factor about willful infringement and bad faith, as well as what it took to get there, to unravel the customer confusion. Because we're dealing with a situation that was much, much more widespread than just one customer. That one customer that had approached us, again, angrily at a trade show, bringing this to light in the first place, which caused issues in the first place. So we're not just looking at an injunction to stop it. We're looking at trying to address the root cause. And the root cause here was determined through very necessary discovery. And how did the stipulation of the final judgment, how did that implement additional corrective relief about things you learned in discovery, for example, that was not implemented and available and instituted through the preliminary injunction? In four ways, at least, I'd suggest to you. So one way that was done was determining the true scope of the customer confusion so that MKA could take appropriate steps, as well as to make sure this is kind of a twin pillar of that, that there's appropriate deterrence to make sure similar events don't take place. Well, but that — I don't understand how that's relief. It's helpful in information, but I — and so discovery was interesting and valuable to you, maybe, is what you're saying. But I'm asking you, if you put side by side the preliminary injunction and the permanent injunction, I'm still not hearing anything that actually is additional relief from the court because it's a judicially sanctioned change in the party's relationship. So what is the additional judicially sanctioned change implemented by the final that's not in the preliminary? The additional sanction, again, we're not looking just at stopping the confusion. We're looking at unraveling and addressing the confusion in the first place. But how is that — how is the unraveling judicially sanctioned change in the relationship? I — going back to the four ways, and I recognize I'll rely upon the first one that I shared, which was important to discover the true scope of the confusion that was caused here. So that's number one. Number two, we talked about the website. The website wasn't just Ms. Cross directly reaching out to people. It was a public ability to reach out to others. Again, creating an impression on the Internet, a widespread forum available to all, suggesting that there was an exclusive license held by the ASAP parties to take these actions. The third relates to the more general idea of what were the damages and what were the advertising caused by that. Now, I realize that's not addressed in the stipulation, so perhaps I'm getting a little bit of field in that regard. But to address that, part of the other argument that was made that was necessary through the stipulated judgment was that Ms. Cross continued to insist near to the end that she had the permission to do this. Now, discovery was necessary to show that was not true and that she knew that was not true, because what she had was she had a business card from a party saying they're authorized in South Korea, not in the United States, but in South Korea, to take the acts she did both directly with at least seven groups of customers that we learned about, as well as on the Internet. So when you look at that, it was necessary as part of that stipulated judgment to address that root cause that was being spread out, that somehow there was permission given for what she was doing. So the stipulated judgment also addressed that problem, as well as the facts in tying it back to the discovery issues, Judge Miriam. This was something where it was insisted throughout that, well, she wasn't aware that it was just South Korea. But what was discovered in the chat records that were first produced by ASAP, but redacted to cover up these messages, she knew that in June and July of 2021. Before she continued with the TD group to try and execute a contract, active negotiations to execute a contract. Before she continued with the M42 group, right on the cusp of a contract, before they traveled to Serbia to determine that her lies were untrue, and then approached MKE angrily at a forum. So that was an additional aspect that discovery was absolutely necessary, were not just from the parties, but we had to go to Mr. Astor and others to obtain that discovery to show that that was simply not true. And what is it, I've got stipulated final judgment open. Where do I find the relief relating to that factor in here? I'm sorry. So the stipulated final judgment. Right. Because what I'm asking you is. Okay. And we're going to move on from this now, because I've occupied all of your time and not let my colleagues. These were questions I would have tried to answer in any event. I appreciate, Judge Miriam. So the stipulated final judgment I don't have in front of me. These were addressed as part of the pretrial submissions, which then led to the stipulated pretrial judgments. I believe it's paragraph 17, 21, and 22. I'm looking at the stipulated final judgment. Some attorneys use. Yes. And I'm asking you where in the stipulated final judgment does it. Because what you're telling me is the reason that there's a difference between the preliminary and the final is those four things. Okay. And what I'm saying is you need to take one step back, if I respectfully submit, and look at what was the pretrial submission that led to that stipulation. In the pretrial stipulation, I believe it's A251 as part of the record. I could be wrong on that, but as part of the pretrial submissions, that's where, you know, as part of that pretrial submission process, those lies came to bear. That there was. Okay. So it's not in the stipulation of judgment. Correct. It's the pretrial. I'm just going to tell you there's other documents that talk about it. What I am asking you, the actual judgment that determines the rights of the parties as judicially sanctioned does not include a specific reference to these things. It does not, Your Honor. But that's also. I certainly wouldn't suggest that the stipulated final judgment ignores the history that brought us there in the first place. No, no. In light of all these submissions, you all have agreed on something, but it doesn't say the court orders that this website be taken down and this person be called and told Ms. Cross was lying and that this business card be turned over and never used again, right? It does not, but that's because we took the time and had to expend the energy to address those steps in the first place, which led to the decision by the defendant, rather than to face a public trial, that they would stipulate to those things, including willfulness. Again, the core of their willfulness argument was that they did not act willfully because they had permission. But discovery, again, pulled every step of the way, showed that wasn't true, including through the redactions to the chat records. I know I reserve some time, I think only a minute. Perhaps I should save that remaining rebuttal time to address any other questions or to address those positions. Thank you. Thank you.  May it please the Court. I'm Richard Mandel of Calendibut and Lattman for the appellee's ASAP defendants. Judge Subramanian correctly determined on summary judgment to dismiss all claims for monetary relief, and he also correctly denied MKE's motion for attorney's fees. And I think the critical point here is what Your Honor was getting at. Right from the outset, our client came in, they stipulated to a preliminary injunction, and the case was essentially over for all purposes. The use of the mark had stopped. There was nothing to fight about. Nobody was claiming a continuing right to use this trademark. And all the things that Mr. Ruskoski is talking about in the permanent injunction, they're not — none of that is addressed. You know, the preliminary injunction stopped all use, any use against any customer, and the permanent injunction made that final, that we weren't going to use this, we hadn't been using for some time. And the reality of the situation is that very early on, in November of 2022, after the preliminary injunction had been ended, we were in front of Judge Gardefee, and he said to the parties quite clearly what would be irrational here is to litigate for two more years. You know, it's going to be very hard to prove any monetary damages. There were no sales here that were ever made. And what makes sense is for this to just be ended. And instead, MKE insisted on litigating this case for two years, pursuing multimillion-dollar damage claims, hiring an expert who they brought in and presented theories that Judge Subramanian said did not even come close to being something that could be presented to a jury. And — If your adversary is taking the position that the resolution that the district court came to basically lets your client off scot-free for dishonest and illegal conduct. I don't think so, Your Honor. The bottom line is the plaintiff has to prove damages. And they couldn't prove it. They had no admissible evidence to prove it. It's not unusual in a trademark case to not get damages. An injunction is often the form of relief that you get. Now, the defendant never made a single sale here. That's undisputed. So it's not like there were sales that were ever made. The plaintiff had the burden to come forward with admissible evidence that would prove that they suffered harm in some way. And what Judge Subramanian found is they completely failed to do that. Their claim for corrective advertising, they said that they spent millions of dollars in corrective advertising. They never produced the ads. They never showed any — they never put in a witness who said, here's the corrective advertising we ran, here's why we had to run it. They pointed to a general increase in a category of marketing, sales, and distribution that their expert conceded included all kinds of things other than advertising. So there was just no admissible proof in front of the Court to sustain that claim under the law. And Judge Subramanian correctly said that there's no basis for it. And with respect to the reasonable royalty remedy, which is the other remedy they're appealing here, you know, the law is pretty clear on that, that it's atypical in trademark cases, generally reserved for situations in which there's an existing licensing arrangement between the parties. That didn't happen here. You had none of the indicia that would make a reasonable royalty an appropriate remedy here. You had no prior licensing arrangement between the parties. You had no licensing whatsoever of the MKE trademark to anyone, not just to the defendant, but to any party. You had no infringing sales. You had no projections of any sales that defendant would have made, that the plaintiff had, you know, expected to make in the U.S. market. You had an erratic sales history in which the plaintiff hadn't made a single sale in the U.S. market in the previous four years. And then you had some unconsummated transactions that were completely unlikely to have ever been fulfilled by this plaintiff. Given all that, Judge Subramanian correctly found as a matter of law that a reasonable royalty remedy would be completely speculative under these circumstances. And on top of all that, you have that even if this was the unusual case in which you were going to award a reasonable royalty, Judge Subramanian found that the comparables that were being relied on for by MKE's expert were far from comparable. They involved different forms of intellectual property, different products. They involved different territories, and they involved, you know, celebrity endorsement deals. They were very far afield. And so the judge correctly decided under Daubert that even if I was thinking that this was a proper fit for a reasonable royalty, which I don't, there's no evidence here that passes muster under Daubert. So the bottom line is we litigated for two years, and all of the claimed damages were utterly devastated and thrown out, and most of their expert's report was thrown out. They tried to rely on hearsay statements from MKE to their expert that their expert didn't even put in the report, and it's not a proper basis under Marvel Characters v. Kirby. This Court has made clear that even though an expert can rely on hearsay, that doesn't become a basis to put hearsay evidence in for the truth of the matter. There was no actual evidence to show there was ever any corrective advertising done here. Given all of that background, the Court was clearly within its discretion to decide this was not an exceptional case in which to award attorneys' fees. And, you know, the Supreme Court has made clear in Octane Fitness that willfulness is not alone the standard. There were plenty of cases even before Octane Fitness in which attorneys' fees were denied notwithstanding willfulness. After Octane Fitness, it's even more common. And this Court in Four Pillars said that, you know, willfulness does not create any presumption of attorneys' fees. And I think the practical reality is you look at the totality of the circumstances, what the Court said here is, as a practical matter, this is a case that should have been closed up, you know, right from the outset. They said mea culpa. They came clean. And the things that, you know, Mr. Ruskoski is talking about are not even established in the record. He's talking about this website. You know, Ms. Cross testified that the website got pulled down within a couple of weeks of August of 2022 when she came in and voluntarily talked to the other side right when they brought the lawsuit. They never moved for contempt, and they were filing plenty of motions because they filed a motion unsuccessful to try and get certain relief, you know, on other things. The only evidence of the website is all dated before September. So it's just not borne out by the record. And in terms of finding out the scope, they didn't uncover any other entities that proved to be meaningful in any way. And we produced in discovery all the documents that showed whatever we were trying to do. They had all that. They couldn't turn any of that into a viable claim for damages. And Judge Superminium was well within his discretion in deciding that this is not an inability to prove damages in its own conduct. And unless the Court has any questions, we rest on our feet.  Thank you.  Just briefly, Judge Miriam, I gave you a cite earlier of A251. It should be A541, so my apologies for that error. Just turning to three points that I think are important to make here. Under the Deering case, it's a Second Circuit 1959 case that allowed reasonable royalties in the trademark infringement case. There's no circuit directive that you need to have an established license relationship. There's none. And, you know, when we look at various other cases, the influx of other cases throughout the country, I can't point to a Second Circuit case because it's not been decided here, but other cases saying, especially in the Internet age, that you do not need that prior licensing relationship. Here, with that backdrop in mind, really in terms of the damages, there's two key things we want to reemphasize in terms of the errors of the Court. The first is in terms of the reasonable royalty. Judge Subramium just didn't think their parties would have a hypothetical negotiation. That exceeded his role as a gatekeeper. He was weighing disputed facts rather than looking at the evidence presented, where both sides admitted MKE uses distributors, that they get paid a commission or the equivalent of a royalty. On the other hand, ASAP does the same, recognize they need to do the same. Just to wrap up that thought then as well, similarly relating to the corrective advertising, there was fact-finding going on, not just gatekeeping, and even perhaps the most, you know, striking one of those is saying, well, I don't know who that was that spoke to Ms. O'Neill, even though in Ms. O'Neill's deposition, she said at the record, both page 701 and 751, that it was Mr. Topoloma. So the ---- Although he wasn't disclosed in the interrogatory responses as one of the people with information about this. He was disclosed separately in the initial disclosures, not in the interrogatory responses. Not in response to the specific question about damages. That's correct. He was not the person in that regard. But he was disclosed in the disclosures, Your Honor, in that regard, as well as the fact that it was just wrong to say that person wasn't identified when it was. He's also referenced in paragraph 47 of Ms. O'Neill's report. With that, I've seen I've exceeded my time. Thank you very much for your time. Thank you both. Court is adjourned.